IN RE APPLICATIONS A-15995 AND A-16006 OF THE TWIN PLATTE NATURAL RESOURCES DISTRICT.
TWIN PLATTE NATURAL RESOURCES DISTRICT, APPELLANT, V. STATE OF NEBRASKA, DEPARTMENT OF WATER RESOURCES, APPELLEE.

390 N.W.2d 506

Filed July 18, 1986.   No. 85-473.

Jess C. Nielsen of Nielsen & Birch, for appellant.

Robert M. Spire, Attorney General, and LeRoy W. Sievers, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

WHITE, J.

On September 23 and October 9, 1981, the Twin Platte Natural Resources District, a public body organized under the provisions of Neb. Rev. Stat. ch. 2, art. 32 (Reissue 1983), filed applications (hereinafter application) with the Department of Water Resources of the State of Nebraska for a permit to impound water from the Platte River at a point "southwesterly from the town of Ovid, Colorado." In the application, Twin Platte specifically referred to "Article VI, South Platte River Compact." The compact was executed in 1923 and generally provides for the allocation of the water of the South Platte between the States of Nebraska and Colorado. For the purpose of the compact, the river is described as consisting of an "upper section," generally reserved exclusively to uses of Colorado residents, and of a "lower section," subject to use by residents of both states. The compact further provides for the maintenance of a "stream gaging station" at Julesburg to measure the amount of water flowing into Nebraska.

Article VI provides in pertinent part:

It is the desire of Nebraska to permit its citizens to cause a canal to be constructed and operated for the diversion of water from the South Platte River within Colorado, for irrigation of lands in Nebraska; that said canal may commence on the South bank of said river at a point southwesterly from the town of Ovid, Colorado, and may run thence easterly through Colorado along or near the line of survey of the formerly proposed "Perkins County Canal" (sometimes known as the "South Divide Canal") and into Nebraska, and that said project shall be permitted to divert waters of the river as hereinafter provided. With respect to such proposed canal it is agreed: (1) Colorado consents that Nebraska and its citizens may hereafter construct, maintain, and operate such a canal and thereby may divert water from the South Platte River within Colorado for use in Nebraska, in the manner and at the time in this article provided, and grants to Nebraska

and its citizens the right to acquire by purchase, prescription, or the exercise of eminent domain such rights of way, easements or lands as may be necessary for the construction, maintenance, and operation of said canal; subject, however, to the reservations and limitations and upon the conditions expressed in this Article which are and shall be limitations upon and reservations and conditions running with the rights and privileges hereby granted, and which shall be expressed in all permits issued by Nebraska with respect to said canal. (2) The net future flow of the Lower Section of the South Platte River, which may remain after supplying all present and future appropriations from the Upper Section, and after supplying all appropriations from the Lower Section perfected prior to the seventeenth day of December, 1921, and after supplying the additional future appropriations in the Lower Section for the benefit of which a prior and preferred use of Thirty-five thousand acre feet of water is reserved by subparagraph (a) of this article, may be diverted by said canal between the fifteenth day of October of any year and the first day of April of the next succeeding year subject to the following reservations, limitations and conditions: (a) . . . Colorado hereby reserves the prior, preferred and superior right to store, use and to have in storage in readiness for use on and after the first day of April in each year, an aggregate of thirty-five thousand acre feet of water . . . . (b) Subject at all times to the reservation made by subparagraph (a) and to the other provisions of this Article, said proposed canal shall be entitled to direct five hundred cubic feet of water per second time from the flow of the river in the Lower Section, as of priority of appropriation of date December 17th, 1921, . . . of any year and the first day of April of the next succeeding year upon the express condition that the right to so divert water is and shall be limited exclusively to said annual period and shall not constitute the basis for any claim to water necessary to supply all present and future appropriations in the Upper Section or present appropriations in the Lower Section and those hereafter

to be made therein as provided in subparagraph (a). (3) . . . Any surplus waters of the river, which otherwise would flow past the Interstate Station during such period of any year after supplying all present and future diversions by Colorado, may be diverted by such a canal, subject to the other provisions . . . . (6) Nebraska shall have the right to regulate diversions of water by said canal for the purposes of protecting other diversions from the South Platte River within Nebraska and of avoiding violations of the provisions of Article IV; but Colorado reserves the right at all times to regulate and control the diversions by said canal to the extent necessary for the protection of all appropriations and diversions within Colorado or necessary to maintain the flow at the Interstate Station as provided by Article IV of this Compact.

The reference to the "Perkins County Canal," not otherwise explained, is obviously to a proposed diversion plan that never took place.

On April 26, 1982, the department wrote to the applicant, informing it that a hearing on the application "will likely not commence for some time," and advising the applicant:

Before a hearing convenes, however, the department expects to receive evidence that NRD consultation with the Game and Parks Commission has taken place. Furthermore, the Twin Platte NRD must have determined that the project will not jeopardize the continued existence of endangered or threatened species or result in destruction or modification of their habitat.

On March 11, 1983, the department again wrote to the applicant, stating:

After reviewing our schedule for Platte River water right applications, it appears that we shall take up your project before the end of this year. Barring unforeseen circumstances, we shall take up the Perkins County Canal before the so-called Landmark project. To minimize time delays we are advising you now.

As you know, our Supreme Court has ruled that under the provisions of the Non-game and Endangered Species Act all state agencies and political subdivisions must

consult with the Game and Parks Commission in connection with projects such as yours. For reasons of efficiency, we shall expect your compliance with the statute and that directive _prior_ to the start of the department's hearing.

On September 21, 1984, the department again wrote to the applicant, stating the following:

My March 11, 1983, letter requested that the Twin Platte NRD comply with the provisions of the Nongame and Endangered Species Act prior to our proceeding on your project applications. As proceedings on the Catherland and Enders' applications are nearing conclusion, action on your project draws nearer.

By October 5, 1984, please provide me documentation that consultation has been completed or, in the alternative, an activity update and expected completion date for compliance with the Act.

On October 2, 1984, the appellant responded to the requests of the department. In its letter appellant indicated that informal consultation with the Game and Parks Commission had started on April 15, 1983, and continued through October 1, 1984, the day previous to the date of the letter.

In its letter appellant outlined various areas that it asserted must be studied before formal consultation with Game and Parks could begin. The list included: (1) Developing flow data; (2) Developing alternatives for operation; (3) Obtaining the results of flow studies, part of what is referred to throughout as the "Prairie Bend Study"; and (4) Determining the water right date of December 17, 1921.

On February 4, 1985, the director issued an order directing the applicant to show cause on March 1, 1985, why its application should not be dismissed. The director assigned as the reasons for the proposed action:

1. A-15995 and A-16006 are intended for a project not consistent with the features and components of the Perkins County Canal project as envisioned and intended by those who drafted and approved the South Platte River Compact, and is, therefore, in violation of said Compact. The Department has made this determination by

reviewing records of the states of Nebraska and Colorado and the United States Congress, made a part of the record herein by an order dated January 31, 1985.

2. The Twin Platte NRD has failed to comply with the Director's August 26, 1982, letter requesting that the Twin Platte NRD fulfill all of the requirements of the Nongame and Endangered Species Conservation Act.

The order was the first indication by the director that the application was somehow different from that allowed by the compact and therefore prohibited.

Appellant filed various pleadings with the department on essentially two separate points. The appellant contended, first, that the construction of the compact's limitations adopted by the director was incorrect and, second, that the provision of the compact insofar as it allows for withdrawal of water from the Platte River is not subject to the Nongame and Endangered Species Conservation Act, and in any event, the submission of the proposed application to the Game and Parks Commission should not be required until a determination of all other issues, especially the priority date (1921 or 1981). On March 7 the director dismissed the application, holding against the applicant on all issues.

Pursuant to Neb. Rev. Stat. § 46-235 (Reissue 1984), the applicant moved for a hearing. The hearing was held on April 15. On May 23, 1985, the director again dismissed the petition for failure to comply with the Nongame and Endangered Species Conservation Act, but did not reaffirm his previous holding that the application did not disclose a use consistent with the compact, merely noting that "[w]hether Applicant's project is the same, similar, or quite different from the one laid out in Exhibit 2 [the compact] still remains unknown."

The applicant timely appeals. The errors assigned essentially give rise to two issues, i.e., whether the director was arbitrary or capricious in requiring, as a condition precedent to the consideration of the application, prior compliance with the Nongame and Endangered Species Conservation Act, and whether the provisions of that act apply to proposed withdrawal of compact water. Appeals from decisions of the department are authorized pursuant to Neb. Rev. Stat.

§ 46-210 (Reissue 1984). The provisions of the Administrative Procedures Act are applicable to the department. Neb. Rev. Stat. §§ 84-901 et seq. (Reissue 1981); *In re Water Appropriation Nos. 442A, 461, 462, and 485*, 210 Neb. 161, 313 N.W.2d 271 (1981). In *Haeffner v. State*, 220 Neb. 560, 371 N.W.2d 658 (1985), we held that our review of an agency's decision under the Administrative Procedures Act is de novo on the record. Accordingly, we review the record under this standard.

The questions of the merits of the applicant's proposed use as an article VI withdrawal and the priority date to be assigned were not decided by the director. We note that the State concedes that as to the merits, the dismissal is without prejudice.

The compact generally provides that the water in the upper section of the South Platte River is reserved to the State of Colorado. Colorado may keep all water in the lower section of the South Platte except for certain exceptions not here involved (Western Irrigation and Lodgepole Creek), and except for the diversion authorized by article VI, which is limited to winter months and to a prior storage right of Colorado of 35,000 acre-feet. The compact allows withdrawal of article VI water in Colorado, along the line of the proposed Perkins County Canal, such water to be used for purposes of irrigation without any specific area being mentioned.

When a state enters into an interstate compact with another state and the compact is approved by Congress, the state surrenders a portion of its sovereignty and may not unilaterally legislate so as to place burdens on the compact in question. *Del. River and Bay Auth. vs. Carello, et al.*, 43 Del. Ch. 213, 222 A.2d 794 (1966). See, also, *Nardi v. Delaware River Port Authority*, 88 Pa. Commw. 558, 490 A.2d 949 (1985); *Kansas City Area Transp. Auth. v. State of Mo.*, 640 F.2d 173 (8th Cir. 1981). Congressional consent of an interstate compact transforms the compact into a law of the United States to which no court may order relief inconsistent with its express terms. *Texas v. New Mexico*, 462 U.S. 554, 103 S. Ct. 2558, 77 L. Ed. 2d 1 (1983). Additionally, a compact is not only a law but also constitutes a contract between the contracting parties. *C.T.*

*Hellmuth v. Washington Metro. Area Trans.*, 414 F. Supp. 408 (D. Md. 1976).

On the other hand, the state is not prohibited from passing legislation regarding the same subject matter as a compact. *Henderson v. Delaware River, etc., Comm.*, 362 Pa. 475, 488, 66 A.2d 843, 849-50 (1949), held that "[i]t is within the competency of a State, which is a party to a compact with another State, to legislate in respect of matters covered by the compact so long as such legislative action is in approbation and not in reprobation of the compact."

We note that the Nongame and Endangered Species Conservation Act (Neb. Rev. Stat. §§ 37-430 to 37-438 (Reissue 1984)) is not facially abhorrent to article VI of the compact. The act does not by its terms prohibit the activity proposed by the applicant. Whether, in fact, the act would prohibit the proposed withdrawal and thereby frustrate the compact and the legal effect of such frustration is not before us. We are also conscious that:

> The Act imposes two obligations on all state departments and agencies. One is that all state departments and agencies must, *after consulting* with Game and Parks, carry out programs for the conservation of endangered species, and the second is that all state departments and agencies must not take any action that will result in jeopardizing the continued existence of endangered or threatened species or result in the destruction or modification of a habitat of such species. § 37-435(3).

(Emphasis in original.) *Little Blue N.R.D. v. Lower Platte North N.R.D.*, 210 Neb. 862, 866, 317 N.W.2d 726, 730 (1982).

Having concluded that the compliance with the Nongame and Endangered Species Conservation Act does not facially conflict with the compact, did the director act arbitrarily in requiring the applicant to first consult with the Game and Parks Commission before passing on the application?

In urging that the director did so act, the applicant points out that absent a determination that applicant was eligible for the compact priority date (1921), any permit would be useless as it is generally conceded that priorities subsequent to 1921 have

exhausted the Platte River. Applicant asserts that the research necessary for compliance with the Nongame and Endangered Species Conservation Act would exceed $200,000, and such expenditure would be wasteful and unnecessary if it were not ultimately allowed the earlier priority date. In response, the director points out that the request to bifurcate the hearing was not presented until the order to show cause was entered 3¹/₂ years after the application was first filed.

The director must be conceded, in the normal course of the discharge of his duties, the authority to prescribe an orderly procedure in the resolution of matters before him. See *Basin Elec. Power Co-op v. Little Blue N.R.D.*, 219 Neb. 372, 363 N.W.2d 500 (1985). Although not argued, the cost to the State of a hearing on the application, including notices to persons who could be affected by the grant of the application, that depending on the Game and Parks Commission's determination, is a factor that could legitimately be considered by the director.

Courts are loathe to interfere in the internal affairs of agencies and to specify the order in which their statutory duties should be discharged, and no sufficient reason is presented here to dictate a different result. In addition, we have previously said that agencies have the authority to dismiss matters which are not diligently prosecuted. *Schaeffer v. Hunter*, 200 Neb. 221, 263 N.W.2d 102 (1978).

The order dismissing the application is affirmed.

AFFIRMED.