IN RE APPLICATION A-15738 OF THE HITCHCOCK AND RED
WILLOW IRRIGATION DISTRICT ET AL.
HITCHCOCK AND RED WILLOW IRRIGATION DISTRICT ET AL.,
APPELLANTS, V. LOWER PLATTE NORTH NATURAL RESOURCES
DISTRICT ET AL., APPELLEES.
410 N.W.2d 101

Filed July 31, 1987.   No. 86-008.

Robert B. Crosby and Steven G. Seglin of Crosby, Guenzel, Davis, Kessner & Kuester, for appellants.

Robert M. Spire, Attorney General, and LeRoy W. Sievers, for appellee State of Nebraska.

George E. Svoboda of Sidner, Svoboda, Schilke, Wiseman, Thomsen, Holtorf & Boggy, for appellees Lower Platte North Natural Resources District et al.

Lyle B. Gill, Fremont City Attorney, for appellee City of Fremont.

Richard G. Kopf of Cook, Kopf & Doyle, P.C., for appellee Central Platte Natural Resources District.

Jess C. Nielsen of Nielsen & Birch, for appellee Twin Platte Natural Resources District.

Christopher H. Meyer, for appellee National Wildlife Federation.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, and GRANT, JJ., and McCOWN, J., Retired.

HASTINGS, J.

Three irrigation districts in southwest Nebraska appeal from an order entered by the director of the Nebraska Department of Water Resources (department) denying their application for authority to divert water from the South Platte River for storage in Enders Reservoir near Imperial, Nebraska. We

affirm.

The Hitchcock and Red Willow (H & RW), Frenchman Valley, and Frenchman-Cambridge Irrigation Districts filed an application with the department on December 19, 1980, for a permit authorizing the impoundment of approximately 45,000 acre-feet of water in Enders Reservoir. The source of water was listed as the South Platte River at a location near Big Springs, Nebraska. The appellants proposed a transbasin diversion of water from the South Platte River basin to the Republican River basin, as the water would be transported about 45 miles south by pipeline or canal to the Frenchman River, which flows into Enders Reservoir and eventually into the Republican River. Such a diversion was proposed to supplement the diminished flows in the Frenchman River and resulting lower water levels in Enders Reservoir brought about in part by increased groundwater development in the area. The appellants listed 1990 as the approximate date that water would first be impounded.

The magnitude of the record in this case points out the difficult and almost impossible task that our own rules have imposed upon this court. The application for diversion was filed with the Nebraska Department of Water Resources on December 19, 1980, which resulted in over 30 days of hearings culminating with an order entered by the director on November 4, 1985. The direct testimony constitutes approximately 5,600 pages of the bill of exceptions, consisting of some questions nearly a page in length and many answers covering several pages. In addition, there are exhibits in this case exceeding 3,000 pages of testimony from *In re Applications A-15145 through A-15148*, now also pending in this court as case No. 86-692. Finally, there are approximately 400 technical exhibits, ranging from single-page statistical printouts and maps to books and scientific treatises exceeding 400 pages in length.

The foregoing statement is only relevant to point up to us the possible need of altering our appellate practice to require the filing of a manageable statement of the case in lieu of a complete record of this magnitude.

The record does disclose that Enders Reservoir is owned by the Bureau of Reclamation, U.S. Department of the Interior.

Water is delivered from the reservoir to the H & RW and Frenchman Valley Irrigation Districts through canals originating at a diversion dam about 50 river miles downstream from Enders Reservoir. The canals serve about 11,500 acres in the H & RW Irrigation District in Hitchcock and Red Willow Counties and about 9,600 acres in the Frenchman Valley Irrigation District in Hitchcock County, and the two districts together planned to use 35,000 acre-feet of the proposed diversion. The Frenchman-Cambridge Irrigation District, the majority of which is located downstream from the other two districts on the Republican River, joined as an applicant for the remaining 10,000 acre-feet.

Objections to the application were filed by numerous parties, including conservation groups, natural resource districts, and municipalities. The director conducted a lengthy hearing on the application. At the request of the parties, the proceedings were governed by the rules of evidence applicable in district court.

Pursuant to the Nongame and Endangered Species Conservation Act, Neb. Rev. Stat. §§ 37-430 et seq. (Reissue 1984), the applicants and the director initiated consultation with the Game and Parks Commission. The commission prepared a written biological opinion which concluded that the proposed diversion would jeopardize the continued existence of the whooping crane, bald eagle, and least tern. The director first admitted the biological opinion into evidence only to show consultation with the Game and Parks Commission, but he subsequently admitted it for the truth of the matter asserted therein. The director also denied requests by the applicants and one of the objectors for authorization to take depositions of the authors of the biological opinion and to subpoena them as witnesses.

The director issued an order dated November 4, 1985, denying the application and concluding the following: (1) that there was not a source of unappropriated water at applicants' proposed diversion point sufficient to meet their demand; (2) that when considering the provisions of Neb. Rev. Stat. § 46-289 (Reissue 1984), which sets forth factors to consider when evaluating an interbasin transfer of water, applicants

failed to meet the public interest test, most seriously falling short in addressing impacts to fish and wildlife; and (3) that applicants did not overcome the burden placed upon them by § 37-435(3) of the Nongame and Endangered Species Conservation Act to show that their proposal would not adversely impact endangered species.

The applicants raise no issues based on differences of testimony regarding facts, but raise the following assignments of error: (1) that the director incorrectly considered the likelihood of success of the proposed irrigation project when determining whether there was unappropriated water; (2) that the director applied an incorrect balancing test when considering the factors listed in § 46-289; (3) that § 46-289 is unconstitutional; (4) that the director erred in finding that the applicants have the burden of proving compliance with the Nongame and Endangered Species Conservation Act; (5) that the director erred in admitting the biological opinion into evidence; (6) that the director erred in not allowing the authors of the biological opinion to be deposed or called as witnesses; and (7) that § 37-435(3) is unconstitutional as applied to the facts in this case.

We need first to address the standard of review to be applied by this court. In that regard, we have not been completely consistent. In *Ainsworth Irr. Dist. v. Bejot*, 170 Neb. 257, 102 N.W.2d 416 (1960), a water appropriation case, we stated in a rather straightforward manner:

> This court has concluded in cases comparable with that at bar that on an appeal to this court from an order of the Department of Water Resources, the primary questions to be determined are generally whether such department acted within the scope of its authority and whether its findings and order complained of are supported by competent evidence or are unreasonable and arbitrary.

*Id.* at 268, 102 N.W.2d at 423. In other words, that would suggest a review for error rather than a de novo hearing.

Such a review would not be inconsistent with the review of an administrative agency's order on appeal to the district court; i.e., was the order in excess of the statutory authority of the agency and was the order unsupported by competent, material,

and substantial evidence. Neb. Rev. Stat. § 84-917 (Cum. Supp. 1984).

That such an appeal falls under the provisions of the Administrative Procedures Act is suggested by Neb. Rev. Stat. § 84-901 (Reissue 1981), which defines an agency as "each board, commission, department . . . or other administrative office or unit of the state government . . . ." Additional recognition was given to this proposition in the case of *In re Water Appropriation Nos. 442A, 461, 462, and 485*, 210 Neb. 161, 313 N.W.2d 271 (1981), wherein we held that because "the provisions of the Administrative Procedures Act are applicable to the Department of Water Resources . . . [u]pon motion by the appellants, the use of formal rules of evidence could have been required." *Id*. at 167, 313 N.W.2d at 275.

In *Haeffner v. State*, 220 Neb. 560, 371 N.W.2d 658 (1985), we interpreted Neb. Rev. Stat. § 84-918 (Reissue 1981) of the Administrative Procedures Act, which provides that "[a]n aggrieved party may secure a review of any final *judgment of the district court* . . . by appeal to the Supreme Court," which appeal "shall be heard de novo on the record." (Emphasis supplied.) Although perhaps recognizing the absence of logic in requiring this court to review de novo a judgment of the district court which never did have an opportunity to make de novo findings, see concurrences of Shanahan, J., and Boslaugh, J., we nevertheless felt compelled to follow the unambiguous language prescribed by the Legislature. We therefore held that we would review the record of the administrative agency de novo and come to an independent conclusion without regard to what either the agency or the district court had done.

Finally, in the case of *In re Applications A-15995 and A-16006*, 223 Neb. 430, 390 N.W.2d 506 (1986), involving a pure interpretation of law as applied by the Nebraska Department of Water Resources, we perhaps gratuitously, and at least facially logically, following *In re Water Appropriation Nos. 442A, 461, 462, and 485, supra,* and *Haeffner, supra,* determined that "our review of an agency's decision under the Administrative Procedures Act is de novo on the record." 223 Neb. at 436, 390 N.W.2d at 510. We therefore stated that we would review that record under that standard.

However, what we have failed to do, perhaps because that precise issue has not previously been specifically presented to us, is to examine in detail the enabling legislation for an appeal from the Department of Water Resources and the exception as to appeals contained in the Administrative Procedures Act. Neb. Rev. Stat. § 46-210 (Reissue 1984) provides in part as follows:

> The procedure to obtain such reversal, modification, or vacation of any such decision or order upon which a hearing has been had before the Department of Water Resources shall be governed by the same provisions in force with reference to appeals and error proceedings from the district court to the Supreme Court of Nebraska.

Neb. Rev. Stat. § 25-1911 (Reissue 1985) provides that "[a] judgment rendered or final order made by the district court may be reversed, vacated, or modified by the Supreme Court for *errors appearing on the record.*" (Emphasis supplied.)

Finally, § 84-917 of the Administrative Procedures Act, which prescribes the method for the original review of an administrative agency's order, provides further, as subsection (7), "The review provided by this section shall not be available in any case where other provisions of law prescribe the method of appeal."

Because the Administrative Procedures Act provides only for a review by the Supreme Court of the judgment of the district court and not of the agency, because the act is not applicable when another method of appeal has been prescribed, and because another method of review has been provided in the legislation specifically providing for an appeal of the order of the Department of Water Resources, we hold that the proper standard of review for this court to follow in cases such as this one is to search only for errors appearing in the record; i.e., does the judgment conform to law, is it supported by competent and relevant evidence, and was the action neither arbitrary, capricious, nor unreasonable? To the extent that *In re Applications A-15995 and A-16006, supra,* holds to the contrary, it is overruled.

Such position is also supported by logic. We have held in appeals from the Public Service Commission, where review is

also directly to this court, that we would not second-guess the commission or make independent findings or determinations of matters which are peculiarly within its expertise and involve a breadth of judgment and policy determination that will not be disturbed on appeal absent a showing of illegality, arbitrariness, capriciousness, or unreasonableness. *In re Application of Northwestern Bell Tel. Co.,* 218 Neb. 563, 357 N.W.2d 443 (1984).

When consideration is given to the fact that our statutes require that members of the Public Service Commission need only be citizens and voters of the state, Neb. Rev. Stat. § 75-101 (Reissue 1986), whereas the director of the Department of Water Resources, who, together with the state hydrologist, conducted this hearing, is required to be a professional engineer with at least 5 years' experience in a position of responsibility in irrigation work, Neb. Rev. Stat. § 46-701 (Reissue 1984), there would seem to be little doubt but that similar deference should be afforded his expertise involving "judgment and policy determination."

Appellants contend in their first assignment of error that the director applied an incorrect definition of the term "unappropriated water," when he determined there was not a source of unappropriated water at the proposed "diversion point sufficient to meet their demand." They assert that the director incorrectly considered whether in his opinion the proposed irrigation project would be successful, and incorrectly based his decision on his determination that it probably would not be.

Neb. Const. art. XV, § 6, provides in part: "The right to divert unappropriated waters of every natural stream for beneficial use shall never be denied except when such denial is demanded by the public interest." Neb. Rev. Stat. § 46-235 (Reissue 1984) provides in part that "[i]f there is unappropriated water in the source of supply named in the application, if such application . . . is not otherwise detrimental to the public welfare, and if denial of the application is not demanded by the public interest, the Department of Water Resources shall approve the same . . . ." The term "unappropriated water" is not expressly defined in the

irrigation code. Therefore, we must consider the inherent characteristics of the appropriative right to use the state's water, for the term "unappropriated water" finds its correct legal meaning therein.

The use of the water of every natural stream within the State of Nebraska is dedicated to the people of the state for beneficial purposes. Neb. Const. art. XV, § 5. Thus, the first characteristic of the appropriative right is that the holder possesses merely a usufructuary right. *Frenchman Valley Irr. Dist. v. Smith*, 167 Neb. 78, 91 N.W.2d 415 (1958). The appropriator of the waters of a stream acquires a right to the use of such water for beneficial purposes, but does not acquire ownership of such water. *Id*.

The second characteristic of the appropriative right is that the application of water to a beneficial use operates as a condition subsequent which in fact fixes the extent of the right originally acquired. *State v. Birdwood Irrigation Dist.*, 154 Neb. 52, 46 N.W.2d 884 (1951). For example, as part of the requirement of beneficial use, the Department of Water Resources is expressly authorized by statute, after notice and hearing, to forfeit a water right in whole or in part where it appears that the water appropriation has not been used for some beneficial or useful purpose or, having been so used at one time, has ceased to be used for such a purpose for more than 3 years, unless there has been sufficient cause for such nonuse. Neb. Rev. Stat. §§ 46-229.02 to 46-229.04 (Reissue 1984); *In re Water Appropriation Nos. 442A, 461, 462, and 485*, 210 Neb. 161, 313 N.W.2d 271 (1981). In addition, an appropriation right can be lost through abandonment or for nonuser for the amount of time found in Neb. Rev. Stat. § 25-202 (Reissue 1985) regarding actions for the recovery of title or possession of real estate. *State v. Nielsen*, 163 Neb. 372, 79 N.W.2d 721 (1956). Thus, first of all, "unappropriated water" is that water which is available for appropriation because it is not subject to an existing appropriation right.

Neb. Rev. Stat. § 46-203 (Reissue 1984) establishes a "first in time is first in right" seniority system for water appropriations. The priority of an appropriation dates from the filing of an application in the office of the Department of Water Resources

for a permit to make an appropriation. Neb. Rev. Stat. § 46-205 (Reissue 1984). The department is required to have public hearings on such applications, to receive evidence relevant to the matter under investigation, and to render a decision in writing. Neb. Rev. Stat. § 46-209 (Reissue 1984).

The record of the department's proceedings in the present case reveals that the director's conclusion relative to the availability of unappropriated water rests upon a large amount of technical and other evidence showing the historical usage of water taken from the South Platte River and the anticipated usage of such water in the future, taking into account numerous variables. Various expert witnesses testified as to the amount of water available at the proposed diversion point. The estimates of flows available for diversion ranged from an annual average of 6,200 acre-feet based on daily flow records and a facility which could pump 125 cubic feet per second, to an annual average of 26,500 acre-feet based on monthly flow records and a facility which could pump 175 cubic feet per second.

The director determined that an approach using mathematical relationships correlating river reach gains/losses and inflows and outflows, in conjunction with daily measuring station river flow data, was most appropriate for evaluating the existence of unappropriated water in the proposed source of supply. Using elements of this approach, Morton Bittinger, an engineer from Colorado who testified for one of the objectors, estimated that an average of 6,200 acre-feet of water would have been available annually based on daily flow records and a facility which could pump 125 cubic feet per second. Bittinger estimated that 8,400 acre-feet would have been available annually based on daily flow records and a facility which could pump 175 cubic feet per second. Marvin Dan Schmidt, an engineer from California who testified for the appellants, estimated that an average of 15,400 acre-feet would have been available annually based on daily flow records and a facility which could pump 125 cubic feet per second and that an annual average of 18,800 acre-feet would have been available based on daily flow records and a facility which could pump 175 cubic feet per second.

The director considered the fact that periodic water

shortages occur in the South Platte valley, caused in part by climatic factors and extensive upstream diversion. He also considered the impact of the South Platte River Compact, an agreement between Nebraska and Colorado that allocates to Colorado, during parts of the year, much of the water of the South Platte River flowing through that state. In his order denying the appellants' application, the director stated the following: "[I]t is apparent that Applicants' proposal rests upon developing its water supply from a source already extensively exploited . . . . In terms of available water supply, considerable risk is inherent in Applicants' proposal. They seek to remove some, perhaps at times all, of the last drops."

The director acknowledged that there is some unappropriated water available at the proposed diversion point. However, he declined to find the existence of unappropriated water because he considered the amount available to be inadequate. The director stated that "[t]he existence of a dependable water supply is essential to the success of any irrigation project" and that "[a]s an average, less than one-fourth Appellants' maximum demand would have been available at their proposed diversion point." Therefore, he concluded that the application should be denied because "[t]here is not a source of unappropriated water at Applicants' proposed South Platte River diversion point sufficient to meet their demand."

While it is true that some unappropriated water is present during times of high flow at the proposed diversion point, to be available in a practical sense the supply of water must be fairly continuous and dependable. *Wyoming v. Colorado*, 259 U.S. 419, 42 S. Ct. 552, 66 L. Ed. 999 (1922). The director concluded that based on historical flow records, the appellants would not be able to withdraw any water in a number of years, sometimes consecutive. Only in times of prolonged high flows would there be enough water available to enable the appellants to divert the 45,000 acre-feet for which they applied. Clearly, water would not be present in such a quantity as to supply the appellants' desired amount on a fairly continuous and dependable basis. Although appellants do not quarrel with that factual finding, it is their argument that the director is not entitled, as a matter of

law, to base his refusal to allow the application on the unlikelihood of success of the irrigation project.

As early as 1910, in *Young & Norton et al. v. Hinderlider*, 15 N.M. 666, 110 P. 1045 (1910), the New Mexico court held that it was proper to refuse an appropriation of water for a project which appeared doomed to failure. That court stated:

> If there is available, unappropriated water of the La Plata river for only five or six thousand acres of land, it would be contrary to the public interest that a project for irrigating fourteen thousand acres with that water should receive an official approval which would, perhaps, enable the promoters of it to market their scheme, to sell stock reasonably sure to become worthless, and land which could not be irrigated, at the price of irrigated land. . . . The failure of any irrigation project carries with it not only disastrous consequences to its owners and to the farmers who are depending on it, but besides tends to destroy faith in irrigation enterprises generally.

*Id.* at 677-78, 110 P. at 1050.

The Texas Supreme Court also has suggested that the term "unappropriated water" may include the element of sufficiency. In *Lower Colorado River Auth. v. Texas Dept.*, 689 S.W.2d 873 (Tex. 1984), the court set aside a permit granted by the Texas Water Commission authorizing a water district to use 113,000 acre-feet per year from the Colorado River to form a lake. The applicable Texas statute read in pertinent part as follows: "(b) The commission shall grant the application only if: . . . (2) unappropriated water is available in the source of supply . . . ." Tex. Water Code Ann. § 11.134 (Vernon Supp. 1987). The evidence showed that after taking into consideration existing water rights, very little water would be available for appropriation at the proposed reservoir site. The estimated firm yield of the reservoir for the quantities of appropriable water available was 3,120 acre-feet per year. The court set aside the permit because there was an insufficient supply of unappropriated water for the proposed project. See, also, *Tanner v. Bacon, State Engineer, et al.*, 103 Utah 494, 136 P.2d 957 (1943).

In Nebraska, the Department of Water Resources may, upon

examination of an application, endorse it approved for a less period of time for perfecting the proposed appropriation, or for a less amount of water, or for a less amount of land than applied for, and may also impose such other reasonable conditions as it deems appropriate to protect the public interest. § 46-235. In the present case, the director chose not to approve the application for a lesser amount of water. Generally, the word "may" in a statute will be given its ordinary, permissive, and discretionary meaning unless it can be shown that the intent of the drafters would be defeated by the application of such a meaning. *State ex rel. Douglas v. Schroeder*, 222 Neb. 473, 384 N.W.2d 626 (1986). Section 46-235 gives discretionary power of approval to the department. *Custer Public Power Dist. v. Loup River Public Power Dist.*, 162 Neb. 300, 75 N.W.2d 619 (1956). The predecessor to the Department of Water Resources was viewed as having been made the guardian of the public welfare in the appropriation of the public waters of the state, necessarily devolving upon it a large discretion in such matters. *Kirk v. State Board of Irrigation*, 90 Neb. 627, 134 N.W. 167 (1912). In light of this discretionary power, it cannot be said that the use of the word "may" in its ordinary, permissive, and discretionary sense in § 46-235 would defeat the intent of the drafters.

The appellants argue that the director incorrectly refused to consider methods of diversion other than direct pumping from river flow with facilities capable of pumping either 125 cubic feet per second or 175 cubic feet per second and that greater amounts of water could be diverted using other methods. In his order, the director stated that consideration of other types of facilities, which might be less costly and more effective, was not warranted because the use of such devices was not narrated by any of the appellants' witnesses. While the appellants' witness Schmidt mentioned other methods of diversion, such as storage facilities along the South Platte River or the use of a retention recharge facility and a well field, his testimony focused on the use of a pumping facility with a maximum capacity of either 125 cubic feet per second or 175 cubic feet per second. Witnesses for the appellants and the objectors estimated the amount of water available for diversion based on the use of each of the two

facilities, and the possible impacts of the diversion were evaluated based on such facilities.

While "blueprint quality" plans need not be presented when applying for a permit to appropriate water, we agree with the following statement of the Idaho Supreme Court:

> In order to be able to assess a project's impact on the public interest, the project's design must be definite enough to reflect its impacts and implications. . . .
>
> . . . In all cases the plans should be sufficient to generally apprise the public of the efficacy of the proposed use in the planned facility, and of its potential impact.

*Shokal v. Dunn*, 109 Idaho 330, 339-40, 707 P.2d 441, 450-51 (1985). The record in the present case reflects that specific evidence was presented regarding only a pumping facility with a maximum capacity of 125 cubic feet per second or 175 cubic feet per second. Therefore, the director correctly evaluated the application in light of the facilities about which evidence was presented.

There was competent evidence, without regard to the rules relating to transbasin diversion found in § 46-289, to support the proposition that the benefits to the State of Nebraska would be greatly enhanced by using the available unappropriated water, if any, in the central Platte area rather than for the Enders Reservoir diversion. Neb. Rev. Stat. § 46-204 (Reissue 1984) permits denial of water diversion when such denial is in the public interest. Such appears to be the case here.

Because we find that the evidence supports the denial of the application based on a lack of unappropriated water to adequately support the appellants' proposed project, because the director's findings regarding the public interest support a denial of the application, and because the director's findings are not affected by errors of law, we find it unnecessary to consider the appellants' other assignments of error. The order of the Department of Water Resources is affirmed.

AFFIRMED.