IN RE APPLICATIONS T-851 AND T-852.
NEBRASKA PUBLIC POWER DISTRICT, APPELLANT, V.
DEPARTMENT OF NATURAL RESOURCES, APPELLEE.
686 N.W.2d 360

Filed September 10, 2004.    No. S-03-207.

Stephen D. Mossman, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellant.

Jon Bruning, Attorney General, Jason W. Hayes, and Justin D. Lavene for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

PER CURIAM.

## I. NATURE OF CASE

The Department of Natural Resources (the DNR) entered an order affirming an earlier decision of the DNR which canceled 0.65 cubic feet per second (cfs) of incidental underground water storage held by the Nebraska Public Power District (NPPD). NPPD appealed. We moved this case to our docket pursuant to our authority to regulate the caseloads between this court and the Nebraska Court of Appeals. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## II. FACTS

On December 20, 1985, NPPD filed application U-5 for the recognition of incidental underground water storage. An order granting certain water rights was entered by the Department of Water Resources (now the DNR) on November 10, 1987 (November 1987 order). NPPD filed a petition for rehearing, which was granted. Following rehearing, an order dated May 26,

1988 (May 1988 order), was issued, superseding the November 1987 order. For purposes of this case, the May 1988 order concerned two water appropriations: A-2039 and A-2726. The May 1988 order granted NPPD the right to divert a maximum of 331.74 cfs for direct irrigation service and an additional 129.26 cfs of incidental underground water storage and included the following language:

> In instances where less than 23,222 acres were served directly, total direct flow diversions must be reduced by the ratio specified in § 46-231. It follows that to continue as incidental (contrasted to intentional) underground storage, that portion of the total natural flow diversion which would be dedicated as incidental underground storage should be reduced proportionately.
>
> . . . .
> . . . When the amount of water dedicated to direct [irrigation] service is reduced because of the number of acres served (§ 46-231), the amount of water dedicated for incidental underground storage shall be reduced proportionately.

On February 28, 2001, NPPD filed applications T-851 and T-852. It is these applications which are at issue in this appeal. T-851 and T-852 requested a transfer of the location of diversion and use of water for portions of A-2039 and A-2726. In NPPD's view, this transfer was necessary because Terry Crawford, one of NPPD's customers, had informed NPPD that he intended to use an existing ground water well to irrigate by center pivot rather than using NPPD's surface water under the Dawson County Canal. In order to avoid losing the water rights on Crawford's land due to nonuse, NPPD located land on the Gothenburg Canal and applied for a transfer of the surface water rights from Crawford's land to the new land. T-851 and T-852 requested the transfer of 1.67 cfs of water, representing Crawford's 117 acres, previously flowing from the Dawson County Canal to the Gothenburg Canal.

In an order dated June 22, 2001 (June 2001 order), the DNR approved T-851 and T-852 for the transfer of 117 irrigated acres from the Dawson County Canal to the Gothenburg Canal. However, with respect to A-2039, 0.65 cfs of incidental

underground water storage was canceled. NPPD petitioned the DNR for rehearing. Following rehearing, an order was issued on January 29, 2003 (January 2003 order), again ordering the cancellation of 0.65 cfs of incidental underground water storage due to the transfer of 117 acres. In support of the cancellation, the DNR cited language from the May 1988 order which imposed as a condition for some transfers a proportional reduction in water rights. The May 1988 order stated that "[w]hen the amount of water dedicated to direct [irrigation] service is reduced because of the number of acres served . . . the amount of water dedicated for incidental underground storage shall be reduced proportionately."

## III. ASSIGNMENTS OF ERROR

NPPD assigns, rephrased and renumbered, that the DNR erred in (1) canceling 0.65 cfs of incidental underground water storage rights granted under U-5 in its June 2001 and January 2003 orders, because such cancellation was inconsistent with Nebraska's Constitution, statutes, and case law, as well as with the methodology used in the November 1987 and May 1988 orders; (2) finding that NPPD was attempting to collaterally attack conditions placed in the May 1988 order approving U-5; (3) not granting additional cfs for incidental underground water storage rights when 117 acres were transferred from the Dawson County Canal to the Gothenburg Canal; (4) not presenting any evidence to support its June 2001 and January 2003 orders; and (5) relying on adjudications and relinquishments not in the record when issuing its January 2003 order.

## IV. STANDARD OF REVIEW

■ In an appeal from the DNR, an appellate court's review of the director's factual determinations is limited to deciding whether such determinations are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable; however, on questions of law, which include the meaning of statutes, a reviewing court is obligated to reach its conclusions independent of the legal determinations made by the director. *In re Water Appropriation A-4924,* 267 Neb. 430, 674 N.W.2d 788 (2004).

## V. ANALYSIS

### 1. CANCELLATION OF 0.65 CFS OF WATER STORAGE

(a) Collateral Attack of May 1988 Order

NPPD first argues that the cancellation of 0.65 cfs of incidental underground water storage rights is not consistent with article XV of the Nebraska Constitution or with the purposes behind Neb. Rev. Stat. §§ 46-295 to 46-2,106 (Reissue 1998 & Cum. Supp. 2002).

▇ When a judgment is attacked in a manner other than by a proceeding in the original action to have it vacated, reversed, or modified, or by a proceeding in equity to prevent its enforcement, the attack is a collateral attack. *Bartlett v. Dawes Cty. Bd. of Equal.*, 259 Neb. 954, 613 N.W.2d 810 (2000).

NPPD contends that §§ 46-295 to 46-2,106 were intended to protect incidental underground water storage rights, regardless of any change in actual surface irrigation. In essence, NPPD is arguing that the purposes behind the statutes prohibited the DNR from imposing the proportional reduction condition, since it interfered with NPPD's incidental underground water storage rights. However, by arguing that the DNR lacked the authority to impose the proportional reduction condition in the May 1988 order, NPPD is attempting to vacate or reverse that portion of the order. Such an argument is a collateral attack.

▇ Administrative agency decisions determining water rights pursuant to statutory authority involve the exercise of quasi-judicial powers, and when no appeal is taken from such a decision, it becomes a final and binding adjudication. *In re Appropriations D-887 and A-768*, 240 Neb. 337, 482 N.W.2d 11 (1992). Judgments rendered by administrative agencies acting in a quasi-judicial capacity are not subject to collateral attack if the agency had jurisdiction over the parties and the subject matter. *Id.*

NPPD does not contend that the DNR lacked jurisdiction. Moreover, in the May 1988 order, the DNR determined NPPD's surface and underground water rights, a quasi-judicial function. No appeal was taken from the May 1988 order, and it became a final and binding adjudication. The DNR did not err insofar as it concluded that NPPD was attempting to collaterally attack the

May 1988 order with respect to this argument. As a result, this court need not consider whether the condition imposing a proportional reduction included in the May 1988 order violated article XV of the Nebraska Constitution or was inconsistent with the purposes behind §§ 46-295 to 46-2,106.

NPPD also argues that the cancellation of its underground water storage rights was contrary to *In re Application U-2*, 226 Neb. 594, 413 N.W.2d 290 (1987), and the methodology used in the November 1987 and May 1988 orders. As we understand its argument, NPPD is not contending that *In re Application U-2* or these orders prevented the DNR from imposing the proportional reduction condition, but, instead, that *In re Application U-2* and the orders show that the DNR is improperly applying the condition.

Unlike its argument that the DNR lacked the authority to impose the reduction in the first place, NPPD's argument that the DNR improperly applied the condition is not a collateral attack. NPPD is not arguing that the condition should be reversed or vacated, but, instead, is arguing that the condition should be properly applied. Thus, we may consider whether the proportional reduction condition was properly applied in this case under *In re Application U-2* and the methodology of the original orders.

### (b) *In re Application U-2*

NPPD argues that the DNR's cancellation of 0.65 cfs of incidental underground water storage is inconsistent with this court's interpretation of the term "service" in *In re Application U-2, supra*. Using the definition of service in *In re Application U-2*, NPPD argues that seepage from the Dawson County Canal recharged the ground water irrigation wells on the 117 acres which NPPD had transferred from the canal, so those acres should still be considered as part of NPPD's service.

NPPD argues that the question posed is the meaning of the term "service." We disagree, and believe that the question is rather the meaning of "direct irrigation service," the term used in the May 1988 order, which grants NPPD its water rights as follows:

> With some 23,222 acres found remaining in effect under the various natural flow appropriations, Dawson County Canal

may divert a combined maximum 331.74 cfs for direct irrigation service.

In recent years the State has limited natural flow diversions to 461.00 cfs. Allowing maximum natural flow diversions to continue at 461.00 cfs would, by implication, necessitate granting [the difference of] 129.26 cfs for incidental underground storage . . . .

There is no dispute as to how the original grant of water rights was calculated in both the November 1987 and May 1988 orders. Neb. Rev. Stat. § 46-231 (Cum. Supp. 2002) sets forth the proper ratio to apply: "An allotment from the natural flow of streams for irrigation shall not exceed one cubic foot per second of time for each seventy acres of land . . . . Such limitations do not apply to storage waters . . . ." By applying this ratio to the total of 23,222 acres of land, NPPD was entitled to 331.74 cfs. This is the amount which NPPD was granted, with the DNR specifically noting that the grant was "for direct irrigation service."

Section 46-231 expressly provides that the ratio is for "allotment[s] from the natural flow of streams." By implication, then, "direct irrigation service" means irrigation from the natural flow of streams. We conclude also that the natural flow of streams must equate to surface water irrigation, but not underground water storage. This conclusion is reinforced when we consider that incidental underground water storage, the very water right which NPPD contends is part of their direct irrigation service, was granted to NPPD separately from its direct irrigation service in the May 1988 order, and the limitations in § 46-231 specifically exclude storage waters.

NPPD argues that this court must rely on *In re Application U-2*, 226 Neb. 594, 413 N.W.2d 290 (1987), to define the term "service." We disagree. Reference to *In re Application U-2* is not necessary, since a plain reading of the May 1988 order indicates a meaning for the term "direct irrigation service." Furthermore, that case defines the term "service," but does not purport to define "direct irrigation service." NPPD's contention that the DNR's cancellation of 0.65 cfs of incidental underground water storage was inconsistent with *In re Application U-2* is without merit.

### (c) Methodology of Initial Orders

NPPD also argues that canceling 0.65 cfs of incidental underground water storage was inconsistent with the methodology used in the November 1987 and May 1988 orders. In order to understand NPPD's argument, it is necessary to outline the factual background of the applicable orders.

In the November 1987 order, the DNR used the 70-to-1 ratio outlined in § 46-231, and the DNR concluded that the water appropriations served 22,937 acres. The DNR accordingly allotted 327.66 cfs for direct irrigation service and 133.34 cfs as incidental underground water storage for a total of 461 cfs, per the historical natural flow diversion rate.

NPPD requested and was granted a rehearing as to the November 1987 order, and in May 1988, a new order was issued. In the second order, the DNR concluded that it had, in the earlier order, improperly canceled 285 acres due to nonuse. As a result, NPPD's grant was recalculated in the same manner that the November 1987 order was originally calculated. Instead of 22,937 acres, the DNR concluded that 23,222 acres were served directly, for an allotment of 331.74 cfs of direct irrigation service and an additional 129.26 cfs of incidental underground water storage.

Though the number of acres served and the grant of water rights differed, both the November 1987 and May 1988 orders contained the same proportional reduction. The condition in the May 1988 order provided that

> [i]n instances where less than 23,222 acres were served directly, total direct flow diversions must be reduced by the ratio specified in § 46-231. It follows that to continue as incidental (contrasted to intentional) underground storage, that portion of the total natural flow diversion which would be dedicated as incidental underground storage should be reduced proportionately.
>
> . . . .
>
> . . . When the amount of water dedicated to direct [irrigation] service is reduced because of the number of acres served (§ 46-231), the amount of water dedicated for incidental underground storage shall be reduced proportionately.

It is this language which NPPD argues has been improperly applied.

This condition provided the methodology to be applied in the event of a reduction in direct irrigation service. The condition required first that "[i]n instances where less than 23,222 acres [are] served directly, total direct flow diversions must be reduced by the [70-to-1] ratio specified in § 46-231." Under the May 1988 order, 23,222 acres were served directly in the U-5 area. Upon NPPD's request to transfer 117 acres out of the U-5 area, only 23,105 acres remained. An application of the ratio from § 46-231 left NPPD with 330.07 cfs of direct irrigation service, a reduction of 1.67 cfs.

The condition continued, stating that "[i]t follows that to continue as incidental . . . underground storage, that portion of the total natural flow diversion which would be dedicated as incidental underground storage should be reduced proportionately." As noted, NPPD's direct irrigation service of 331.74 cfs was reduced by 1.67 cfs, or 0.5 percent. The proportionate reduction is determined by multiplying that same 0.5 percent by the 129.26 cfs of incidental underground water storage. That calculation equates to a 0.65 cfs reduction.

NPPD, however, argues that since an increase in the number of acres served from the November 1987 to the May 1988 order resulted in an increase in its direct irrigation service and an equal decrease in its incidental underground water storage, the current decrease of 117 acres served indicates that NPPD's incidental underground water storage should have been increased, even as a portion of its direct irrigation service was transferred out of the Dawson County Canal. NPPD claims that 23,105 acres are now being served and that under § 46-231, NPPD is entitled to an allotment of 330.07 cfs of direct irrigation service and 130.93 cfs of incidental underground water storage. NPPD argues that instead of canceling 0.65 cfs of incidental underground water storage, the DNR should have transferred 1.67 cfs of its diversion from the Dawson County Canal as it did, but also should have increased NPPD's incidental underground water storage by that same 1.67 cfs.

We acknowledge that NPPD is correct in its assertion that a comparison of the November 1987 and May 1988 orders shows

that an increase in the number of acres served resulted in an increase in direct irrigation service and an equal decrease in incidental underground water storage. However, the DNR was not applying the proportional reduction condition in the May 1988 order on rehearing after the November 1987 order. The DNR simply recalculated NPPD's water rights in the May 1988 order because the DNR had improperly canceled 285 acres of land for nonuse in its 1987 order. Upon rehearing and rectification of its error, the DNR was required to recalculate NPPD's affected water rights to effect the additional 285 acres in direct irrigation service.

The proportional reduction condition was included in the May 1988 order as the formula to employ in calculating incidental underground water storage when the number of acres served directly was reduced. To find that a decrease in direct irrigation service would lead to an equal increase in incidental underground water storage would completely ignore the express requirement in the May 1988 order that incidental underground water storage be decreased proportionately. The DNR properly applied the proportional reduction condition of the May 1988 order when it canceled 0.65 cfs of NPPD's incidental underground water storage, and NPPD's argument to the contrary is without merit.

## 2. FAILURE TO INCREASE AMOUNT OF UNDERGROUND WATER STORAGE

NPPD also argues that the DNR erred in not increasing NPPD's incidental underground water storage. We have concluded that the DNR did not err in canceling 0.65 cfs of NPPD's incidental underground water right, as that result was required based upon the proportional reduction condition in the May 1988 order. Thus, we have also decided that the DNR should not have increased NPPD's incidental underground water storage due to the transfer of 117 acres from the Dawson County Canal. This assignment of error is without merit.

## 3. FAILURE TO PRESENT EVIDENCE

In its next assignment of error, NPPD argues that the DNR erred in not presenting evidence at the December 10, 2001, hearing to support its decision to cancel 0.65 cfs of incidental underground water storage.

In *Ponderosa Ridge LLC v. Banner County*, 250 Neb. 944, 554 N.W.2d 151 (1996), this court held that an applicant bears the burden of providing the director enough evidence on which to base a decision. See, also, Neb. Rev. Stat. § 46-294(1)(e) (Cum. Supp. 2002) (applicant has burden of proving that intrabasin transfer will comply with requirements of state law); Neb. Rev. Stat. § 61-206(1) (Cum. Supp. 2002) (burden of proof in hearing before DNR shall be upon person making complaint, petition, and application).

NPPD could not and did not meet its burden of showing that the DNR's decision to cancel certain incidental underground water storage was incorrect. The proportional reduction condition in the May 1988 order dictated the DNR's decision to cancel that underground storage. No showing by NPPD would have been sufficient to overcome the plain language of the May 1988 order. This assignment of error is without merit.

### 4. RELIANCE ON RELINQUISHMENTS AND ADJUDICATIONS NOT IN RECORD

In its final assignment of error, NPPD argues that the DNR relied on relinquishments and adjudications not in the record, asserting that the DNR made two factual findings in the January 2003 order which were based upon prior orders not in the record. These findings purportedly show the manner in which the proportional reduction condition had previously been applied by the DNR with respect to similar applications made by NPPD.

In its brief, the State concedes that the orders should have been placed in the record. However, the State argues that NPPD was not prejudiced by the inclusion of the prior orders in the January 2003 order because the earlier orders were not used to come to the DNR's ultimate conclusion. Rather, the DNR's conclusion was dictated by the condition in the May 1988 order.

NPPD is correct in its contention that the DNR should not have made factual findings regarding these prior orders when issuing its January 2003 order. These particular findings were not made in the June 2001 order which initially canceled the disputed 0.65 cfs of incidental underground water storage. It is clear that these orders were not admitted into evidence, nor was the hearing officer asked to take judicial notice of them. The contested factual

findings are not supported by competent and relevant evidence and thus are in error.

However, error without prejudice provides no ground for appellate relief. *Agri Affiliates, Inc. v. Bones*, 265 Neb. 798, 660 N.W.2d 168 (2003). Though the DNR erred in referring to the earlier orders in the January 2003 order, NPPD suffered no prejudice. The DNR's decision to cancel 0.65 cfs of NPPD's incidental underground water storage is supported solely by the condition included in the May 1988 order. Any reference to other contested orders appears merely to be an attempt by the DNR to illustrate its consistency with respect to the application of this condition. This assignment of error is without merit.

## VI. CONCLUSION

The DNR did not err in canceling 0.65 cfs of NPPD's incidental underground water storage rights. The January 2003 order of the DNR is affirmed.

AFFIRMED.

MILLER-LERMAN, J., not participating.