In re 2007 Administration of Appropriations
of the Waters of the Niobrara River.
Joe McClaren Ranch, L.L.C., and Weinreis Brothers
Partnership, appellants, v. Nebraska Public
Power District and Nebraska Department
of Natural Resources, appellees.

___ N.W.2d ___

Filed July 11, 2014.    No. S-13-702.

1. **Administrative Law: Statutes: Appeal and Error.** In an appeal from the Department of Natural Resources, an appellate court's review of the director's factual determinations is limited to deciding whether such determinations are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable; however, on questions of law, which include the meaning of statutes, a reviewing court is obligated to reach its conclusions independent of the legal conclusions made by the director.

2. **Trial: Evidence: Appeal and Error.** To constitute reversible error in a civil case, the wrongful admission of evidence must unfairly prejudice a substantial right of a litigant complaining about the evidence admitted.

Appeal from the Department of Natural Resources. Affirmed.

Donald G. Blankenau, Thomas R. Wilmoth, and Vanessa A. Silke, of Blankenau, Wilmoth & Jarecke, L.L.P., for appellants.

Stephen D. Mossman and Patricia L. Vannoy, of Mattson, Ricketts, Davies, Stewart & Calkins, for appellee Nebraska Public Power District.

Jon Bruning, Attorney General, Justine D. Lavene, and Emily K. Rose for appellee Department of Natural Resources.

Steven C. Smith and Lindsay R. Snyder, of Smith, Snyder & Petitt, a general partnership, for amicus curiae Nebraska State Irrigation Association.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

HEAVICAN, C.J.

## INTRODUCTION

Joe McClaren Ranch, L.L.C., and Weinreis Brothers Partnership, junior river water appropriators, hold appropriations to divert water from the Niobrara River (Niobrara). The junior appropriators petitioned for a hearing before the Nebraska Department of Natural Resources (Department) after receiving closing notices in favor of senior appropriations claimed by the Nebraska Public Power District (NPPD) for its Spencer hydropower plant. The junior appropriators challenged the Department's administration of the Niobrara and sought to stay any future closing notices. On remand from this court, the Department held a hearing and issued an order denying the junior appropriators' claims. The junior appropriators appeal. We affirm.

## BACKGROUND

Joe McClaren Ranch owns real property along the Niobrara in Cherry County, Nebraska. Joe McClaren Ranch applied for an appropriation to divert water from the Niobrara in 2006. When this case began, Jack Bond also owned real property in Cherry County along the Niobrara and held five appropriation rights from the Niobrara for irrigation and domestic purposes, as well as two appropriations from tributaries to the Niobrara for irrigation. Bond's appropriations had priority dates between 1969 and 2006. In 2011, Bond sold his property and assigned his water appropriations to Weinreis Brothers Partnership. The partnership was subsequently added as a party in this case, and Bond was permitted to withdraw.

NPPD is the owner or lessee of three water appropriations for hydropower generation for its Spencer plant located near Spencer, Nebraska. NPPD's appropriations date back to 1896, 1923, and 1942. The Spencer plant is located approximately 145 miles downstream from Joe McClaren Ranch's and Weinreis Brothers Partnership's real property.

On March 2, 2007, NPPD sent a letter to the Department calling for water administration on the Niobrara for the benefit of appropriations for its Spencer plant. On May 1, the Department issued closing notices to approximately 400 junior

appropriators, including Joe McClaren Ranch and Bond, direct-ing them to cease water diversions from the Niobrara. On May 11, the junior appropriators filed a request for a hearing with the Department pursuant to Neb. Rev. Stat. § 61-206 (Reissue 2009). The administration of the Niobrara was delayed at NPPD's request, but on August 1, the Department again issued closing notices to the junior appropriators.

On August 17, 2007, the junior appropriators petitioned for a condemnation award in a separate proceeding, causing the Department to dismiss the junior appropriators' request for a hearing as moot. The junior appropriators appealed. We reversed, and remanded.[1]

After a hearing to consider the junior appropriators' chal-lenges, the Department determined that the appropriation of the Niobrara was proper. The junior appropriators again appealed to this court, and we again reversed, and remanded, finding that the Department had improperly limited the scope of the proceedings to exclude the common-law issues of abandonment and statutory forfeiture from nonuse.[2] In our opinion, we found that the statutory procedure for cancellation of appropriations provided in Neb. Rev. Stat. §§ 46-229.02 to 46-229.05 (Reissue 2010) did not abrogate the common-law methods of cancellation and stated: "On remand, the Department is directed to determine whether NPPD's appro-priations have been abandoned or statutorily forfeited in whole or in part."[3]

The parties stipulated that the previously admitted testimony and exhibits would be admitted at the new hearing, subject to some previous objections. The hearing officer also took notice of the legislative history of 1993 Neb. Laws, L.B. 302, over objection by the junior appropriators.

The evidence showed that prior to 2007, no owner of the Spencer plant had placed a call for administration of the

---

[1] *In re 2007 Appropriations of Niobrara River Waters*, 278 Neb. 137, 768 N.W.2d 420 (2009).

[2] *In re 2007 Appropriations of Niobrara River Waters*, 283 Neb. 629, 820 N.W.2d 44 (2012).

[3] *Id*. at 658, 820 N.W.2d at 67.

Niobrara in over 50 years. NPPD's water resources manager placed the call for administration in 2007, after learning through conversations with the Department in 2006 that, unlike the North Platte and Platte River Basins, the Department was not proactively administering the portion of the Niobrara near Spencer on a regular basis.

NPPD and its predecessor had been maintaining and generating power at the plant, which has been in continuous operation since 1927, except when closed for maintenance or repair. When NPPD placed the call for administration, it was current on lease payments for its water rights. The Spencer plant's three appropriations amount to a total water discharge of 2,035 cubic feet per second (cfs). On approximately 30 separate dates in 2006, the Spencer plant took through its facilities the total amount of flow allotted in NPPD's appropriations for the plant.

After receiving NPPD's call, several flow measurements were taken near Spencer. Initially, these measurements indicated that the discharge was sufficient to meet NPPD's appropriations. However, on April 30, 2007, a measurement was taken approximately 10 miles upstream of the Spencer plant, indicating the total discharge to be 1,993.73 cfs, which was insufficient for the appropriations associated with the plant. After this measurement, on May 1, the Department issued the first set of closing notices to approximately 400 junior appropriators. Administration of the river was delayed in June and July, at NPPD's request, to allow time for NPPD to get subordination agreements in place. By entering into subordination agreements, junior appropriators pay a fee to continue to use water to which the senior appropriator would otherwise be entitled. Another measurement taken on July 31 indicated a total discharge of 902.72 cfs. As a result of this measurement, on August 1, the Department again issued closing notices to junior appropriators.

After the second hearing on remand, the Department issued an order denying the junior appropriators' claims and finding that NPPD did not abandon or statutorily forfeit any or all of its appropriations. The junior appropriators appeal.

## ASSIGNMENTS OF ERROR

The junior appropriators assign the following errors of the Department, restated and reordered: (1) relying on evidence from the hearing officer, which evidence attacked this court's conclusions about common-law abandonment and this court's instructions on remand; (2) finding the junior appropriators failed to prove NPPD had abandoned its appropriations; (3) finding the junior appropriators failed to prove NPPD had statutorily forfeited its appropriations; (4) issuing closing notices without taking into account the subordination agreements and express limitations in NPPD's appropriations; and (5) failing to conduct a futile call analysis.

## STANDARD OF REVIEW

[1] In an appeal from the Department, an appellate court's review of the director's factual determinations is limited to deciding whether such determinations are supported by competent and relevant evidence and are not arbitrary, capricious, or unreasonable; however, on questions of law, which include the meaning of statutes, a reviewing court is obligated to reach its conclusions independent of the legal conclusions made by the director.[4]

## ANALYSIS

*Legislative History of L.B. 302.*

In its first assignment of error, the junior appropriators assert that the Department erred by relying on evidence from the hearing officer, which evidence they claim collaterally attacked this court's conclusions about common-law abandonment and statutory forfeiture. These alleged errors stem from the Department hearing officer's taking notice of the legislative history of L.B. 302, which amended Neb. Rev. Stat. § 46-229 (Reissue 2010).

---

[4] *In re Applications T-851 & T-852*, 268 Neb. 620, 686 N.W.2d 360 (2004); *In re Water Appropriation A-4924*, 267 Neb. 430, 674 N.W.2d 788 (2004); *City of Lincoln v. Central Platte NRD*, 263 Neb. 141, 638 N.W.2d 839 (2002).

The junior appropriators suggest that the hearing officer's decision to take notice of the legislative history, without prompting from either party, constituted improper advocacy. Although the junior appropriators' brief suggests they perceive bias extending beyond official notice of the legislative history, we note that the only relevant objection appearing in the record is the objection to the legislative history and, therefore, this is the only issue preserved for our review.

The Administrative Procedure Act specifically permits an agency to take official notice of cognizable facts if notice is given to the parties, as it was here.[5] Nothing in the act requires such notice to be requested by one of the parties.[6] We have long held that courts may take judicial notice of legislative history,[7] and we see no reason why agencies would not also be permitted to do so.

The Department's order states the legislative history was admitted because it was relevant and not before the Department at the previous hearing, nor in the record for this court to review on the previous appeal.

As we stated in our prior opinion, "[S]tatutes which effect a change in the common law or take away a common-law right should be strictly construed, and a construction which restricts or removes a common-law right should not be adopted unless the plain words of the statute compel it."[8] We have also stated, "For a court to inquire into a statute's legislative history, the statute in question must be open to construction. A statute is open to construction when its terms require interpretation or may reasonably be considered ambiguous."[9]

The legislative history for L.B. 302 was not relevant to the hearing on remand, because this court had previously

---

[5] Neb. Rev. Stat. § 84-914(5) (Reissue 2008).

[6] Cf. Neb. Rev. Stat. § 27-201(3) (Reissue 2008).

[7] See, e.g., *Dairyland Power Co-op v. State Bd. of Equal.*, 238 Neb. 696, 472 N.W.2d 363 (1991).

[8] *In re 2007 Appropriations of Niobrara River Waters, supra* note 2, 283 Neb. at 653, 820 N.W.2d at 64.

[9] *In re Interest of Destiny A. et al.*, 274 Neb. 713, 720, 742 N.W.2d 758, 764 (2007).

held, "The plain and unambiguous language of §§ 46-229 to 46-229.05 merely provides the procedure by which the Department must abide when terminating an owner's or a successor's appropriation right. This language does not explicitly address the common-law theories of abandonment and nonuse."[10] Our prior holding indicates that we did not need to look at the statute's legislative history for intent because the language of the statute is unambiguous. Furthermore, as we also noted in our previous opinion, "Under the law-of-the-case doctrine, an appellate court's holdings on questions presented to it in reviewing the trial court's proceedings become the law of the case; those holdings conclusively settle, for purposes of that litigation, all matters ruled upon, either expressly or by necessary implication."[11]

Our holding on the issue of whether the statute abrogated the common law is the law of the case. Thus, the legislative history of L.B. 302 was not relevant and the Department clearly erred in admitting it.

[2] We have held that to constitute reversible error in a civil case, the wrongful admission of evidence must unfairly prejudice a substantial right of a litigant complaining about the evidence admitted.[12] After reviewing the record, it does not appear that any relevant evidence was excluded as a result of the Department's decision to admit the legislative history. Additionally, the Department made findings of fact, supported by other relevant evidence, including expert testimony and numerous exhibits, related to both abandonment and statutory forfeiture. We conclude the decision to admit the legislative history was harmless error that did not unfairly prejudice a substantial right of the junior appropriators, and we are able to consider the junior appropriators' other assignments of error.

---

[10] *In re 2007 Appropriations of Niobrara River Waters*, *supra* note 2, 283 Neb. at 653, 820 N.W.2d at 64.

[11] *Id*. at 641, 820 N.W.2d at 56.

[12] *Kvamme v. State Farm Mut*. *Auto*. *Ins*. *Co*., 267 Neb. 703, 677 N.W.2d 122 (2004).

*Abandonment.*

In its second assignment of error, the junior appropriators assert that the Department erred in finding the junior appropriators failed to prove NPPD had abandoned its appropriations in whole or in part. The junior appropriators primarily argue that NPPD's failure to call for administration of the river or enter into more subordination agreements with junior appropriators prior to 2007 demonstrates an intent to abandon its appropriations.

Abandonment is a common-law principle. In *State v. Nielsen*,[13] which we discussed in our prior opinion in this case, we stated that "'"'[a]bandonment' is the relinquishment of a right by the owner thereof, without any regard to future possession by himself or any other person, but with the intention to forsake or desert the right."'"

The junior appropriators cite *Mader v. Mettenbrink*,[14] an easement case, for the proposition that acquiescence in adverse acts may evidence abandonment. The junior appropriators do not, however, point to any case law which holds that the failure to place a call for administration, while continuing to use water, may demonstrate an intent to abandon. We also find it persuasive that the Supreme Court of Colorado, in considering the validity of a no-call agreement, held, "There is no requirement that a senior water right holder place a call on the river to effectuate its water rights . . . ."[15]

In finding NPPD did not intend to abandon all or part of its appropriations, the Department noted that the Spencer plant had been in operation, generating power since 1927. NPPD had expended significant funds to staff, operate, and maintain its facility. NPPD was current on lease payments for its appropriations and had, at various points, used the full amount of flow granted in its three appropriations. The Department also noted that NPPD's water resources manager had been under

---

[13] *State v. Nielsen*, 163 Neb. 372, 381, 79 N.W.2d 721, 728 (1956) (quoting *State v. Oliver Bros.*, 119 Neb. 302, 228 N.W. 864 (1930)).

[14] *Mader v. Mettenbrink*, 159 Neb. 118, 65 N.W.2d 334 (1954).

[15] *City of Englewood v. Burlington Ditch*, 235 P.3d 1061, 1069 (Colo. 2010) (en banc).

the mistaken assumption that the Niobrara was proactively administered by the Department, like the North Platte and Platte River Basins. These facts refute any presumption that NPPD's failure to place a call prior to 2007 was evidence that it intended to abandon its appropriations.

The dissent argues that NPPD has "never protected" its 1942 appropriation. However, we emphasize that our focus is on what evidence in the record demonstrates that NPPD intended to abandon its rights, rather than what evidence there is that NPPD acted to preserve its rights. Furthermore, although the dissent suggests that NPPD should have protested the roughly 400 applications for new appropriations that followed NPPD's 1942 appropriation, we have recently reiterated that the "threatened" injury of a new appropriation does not confer standing to challenge an application for an appropriation.[16] Finally, if we were to find that NPPD was required to protect its appropriations, which were public record, by objecting to new applications, we see no reason why the roughly 400 junior appropriators that followed would not also have been required to protect theirs.

In short, the dissent asserts that the Department's method of administering the waters of the Niobrara River Basin is fundamentally flawed and suggests that we impose additional burdens on NPPD as a result. To do so would uproot nearly a century of water law in this state and, further, would stray from the specific issues of this case.

The Department's determination that NPPD did not intend to abandon any or all of its appropriations was supported by competent and relevant evidence and was not arbitrary, capricious, or unreasonable. Therefore, we conclude that the Department did not err in finding the junior appropriators failed to prove NPPD abandoned its appropriations in whole or in part.

*Statutory Forfeiture.*

In its third assignment of error, the junior appropriators assert that the Department erred in finding the junior

---

[16] *In re Application A-18503*, 286 Neb. 611, 838 N.W.2d 242 (2013).

appropriators failed to prove NPPD had statutorily forfeited its appropriations in whole or in part.

The Department's order attempts to address forfeiture from nonuse, but begins that section by stating that "[s]tatutory forfeiture is governed by *Neb. Rev. Stat.* §§ 46-229 through 46.229.05." This is contrary to our holdings in *Nielsen* and our prior opinion in this case that statutory forfeiture is independent of the cancellation proceedings provided for in §§ 46-229 to 46-229.05. We note that the dissent also addresses statutory forfeiture and cites to chapter 46 of the Nebraska Revised Statutes for the proposition that an appropriation may be forfeited "in whole or in part." However, what is at issue in this appeal is common-law nonuse, which is governed by Neb. Rev. Stat. § 25-202 (Reissue 2008).

In *Nielsen*, we found that in addition to loss through abandonment, an appropriation right could be lost through nonuse for the period of statutory limitations relating to real estate.[17] Under § 25-202, "An action for the recovery of the title or possession of lands, tenements, or hereditaments . . . can only be brought within ten years after the cause of action accrues." In other words, a lack of beneficial use for more than 10 years may result in the loss of an appropriation.

In finding nonuse in *Nielsen*, we noted that the predecessor in title did not do any work on the irrigation system of the premises, did not irrigate the farm for the 11-year period of possession, and ignored a cancellation proceeding notice.[18] In *Kersenbrock v. Boyes*,[19] we found nonuse of an appropriation where, for more than 10 years, the claimant's dam was not in a condition to generate power to pump water for irrigation or run a gristmill.

The Department's order improperly focuses on a finding that there was not sufficient evidence to justify a cancellation proceeding under §§ 46-229 to 46-229.05. Despite reliance on the incorrect statutes, the Department made factual findings

---

[17] *Nielsen, supra* note 13.

[18] *Id.*

[19] *Kersenbrock v. Boyes*, 95 Neb. 407, 145 N.W. 837 (1914).

based on the evidence in this case that do not support a finding of nonuse. NPPD's Spencer plant was operating by using water from the Niobrara to generate power and had been doing so for more than the past 10 years.

The junior appropriators suggest that NPPD was not using all of its 2,035 cfs for the past 10 years. Even assuming, as do the junior appropriators and the dissent, that it is possible to lose part of an appropriation, the evidence showed that at numerous points in 2006, NPPD was utilizing the full 2,035 cfs. As such, it is clear that any partial nonuse of the water did not continue for a 10-year period.

Because the Department's factual findings demonstrate there was no 10-year period of nonuse, we conclude NPPD did not statutorily forfeit its appropriations under § 25-202.

*Limitations on NPPD's Appropriations.*

In its fourth assignment of error, the junior appropriators assert that the Department erred in issuing closing notices without taking into account the subordination agreements and express limitations in NPPD's appropriations.

A field office supervisor for the Department testified that the subordination agreements with NPPD were taken into consideration by the Department. He testified that the Department's policy was to not send closing notices to junior appropriators who have a subordination agreement with the senior appropriator. The junior appropriators suggest the Department's policy of allowing the senior appropriator to place a call for the full amount of its appropriations despite the existence of subordination agreements permits the senior appropriator to collect both money and water.

However, if the junior appropriator is allowed to use water because of a subordination agreement, the senior appropriator is not receiving that to which it is otherwise entitled. It is possible that there are times when the flow of the river might be such that NPPD receives its full 2,035 cfs, despite continued use of water by junior appropriators with subordination agreements. However, if this were always the case, we assume that junior appropriators would not enter into voluntary subordination agreements. Instead, as is clear from the record in

this case, the flow of the river often is not sufficient for all potential users. At these times, NPPD collects a fee from the junior appropriators with subordination agreements, but it does not receive the water that it otherwise would receive, because the junior appropriators with subordination agreements do not receive closing notices. We disagree with the dissent that the election of remedies doctrine is applicable to this case. An appropriator is not permitted to simultaneously enforce its right against, and collect compensation from, the *same* junior appropriator. The Department's policy is not arbitrary, capricious, or unreasonable, and the Department is entitled to deference for its technical expertise in this area.[20]

There was evidence that because one of NPPD's appropriations—for 35 cfs—had, at one time, been relocated to a different point on the river, it was subject to a limitation that NPPD could only call for administration of permits upstream on Minnechaduza Creek and its tributaries. However, the evidence showed that even without considering that appropriation, the flow on April 30, 2007, fell below the amount allotted in NPPD's other two appropriations.

The Department's determination that it had properly determined the flow demand for NPPD's appropriations was supported by competent and relevant evidence and was not arbitrary, capricious, or unreasonable.

*Futile Call Analysis.*

In its fifth assignment of error, the junior appropriators assert that the Department erred in failing to conduct a futile call analysis.

The junior appropriators cite *State, ex rel. Cary, v. Cochran*[21] for the proposition that it "is the duty of the administrative officers of the state to determine from all available means . . . whether or not a usable quantity of water can be delivered." In

[20] See *In re Application A-15738*, 226 Neb. 146, 410 N.W.2d 101 (1987).

[21] *State, ex rel. Cary, v. Cochran*, 138 Neb. 163, 173-74, 292 N.W. 239, 246 (1940).

that case, we addressed the duty of the administrative officers after noting that "[w]hether a definite quantity of water passing a given point on the stream would, if not diverted or interrupted in its course, reach [the senior appropriator] in a usable quantity creates a very complicated question of fact."[22] We went on to say, "It necessarily follows that this finding of fact must be determined in the first instance by the officers charged with the administration of the stream. The finding of fact thus made is final unless it appears that it was unreasonable or arbitrarily made."[23]

The evidence showed that a futile call analysis was not done on the main stem of the Niobrara because it is a "wet river," meaning it always contains flowing water, and the Department determined water from the junior appropriators could therefore reach the Spencer plant. When requested by junior appropriators, futile call analyses were done on tributaries to the river with dry patches.

The Department is entitled to deference in this technical area, and the Department's determination that it had conducted a futile call analysis where appropriate was supported by competent and relevant evidence and was not arbitrary, capricious, or unreasonable.

## CONCLUSION

For the foregoing reasons, the decision of the Department is affirmed.

AFFIRMED.

---

[22] *Id*. at 173, 292 N.W. at 246.

[23] *Id*. at 174, 292 N.W. at 246.

CONNOLLY, J., dissenting.

The Department's method of administering the waters of the Niobrara River Basin is fundamentally flawed. The problem was caused by too many appropriations for surface water or ground water in the Niobrara River Basin. As we have previously pointed out, under the Department's regulations, it is free to designate the basin or its subparts fully appropriated based

on streamflow data and diversion records.[1] But since March 2007, the Department has instead relied on NPPD's unsatisfied total allotment to declare that the basin fully appropriated and to restrict or to close the water rights of upstream junior appropriators.

The Department's reliance on NPPD's appropriations is flawed because since 1942, NPPD has held appropriations so large that the river's flow at Spencer Dam was insufficient to satisfy NPPD's total allotment most of time. This record contains the recorded flow rates of water passing through Spencer Dam for 68 years—from 1942 to 2009. It shows that on average, Spencer Dam has received its full allotment of 2,035 cubic feet per second (cfs) for 59.7 days a year. More specifically, for 7 months of the year, from July to January, NPPD receives a flow that meets or exceeds 2,035 cfs only 2.4 percent of the time. During the remaining months, from February to June, when the river's flow is greater, it still receives a flow that meets or exceeds 2,035 cfs only 13.2 percent of the time. Yet during all these decades, NPPD has failed to protect its purported right to receive the full amount of its allotment.

Significantly, the Department treats NPPD's 2007 call as a continuing demand for its full allotment of 2,035 cfs. The record does not contain the Department's estimate of the Niobrara's average flow rate. But for this appeal, I will assume that the water flowing through Spencer Dam constitutes a close approximation of the river's average flow rate at the eastern end of the river. According to those recorded flows, from July to January of any given year, the Department will be able to shut down upstream junior appropriators for almost 97 percent of the time, and almost 87 percent of the time from February to June. These junior appropriators have made investments to use their appropriations. To permit NPPD to cause this economic harm in 2007 after acquiescing in the Department's actions for over 60 years is both unjust and contrary to the nature of its permits and the Department's actions. I believe a review of the

---

[1] See *Middle Niobrara NRD v. Department of Nat. Resources*, 281 Neb. 634, 799 N.W.2d 305 (2011).

historical record, which the majority opinion largely ignores, makes these conclusions clear.

HISTORICAL BACKGROUND

The record shows that NPPD holds three appropriations which make up its total allotment of 2,035 cfs. These appropriations have priority dates of 1896, 1923, and 1942, and they were acquired by private companies and a different public power district that are NPPD's predecessors in interest. In 1896, the State granted an appropriation for 35 cfs for a flour mill dam on the Minnechaduza Creek, north of Valentine, Nebraska, in the northwestern part of the state. The Minnechaduza Creek is a tributary stream to the Niobrara.

In 1923, NPPD's first hydropower predecessor requested an appropriation of 1,450 cfs to generate electricity at what would become Spencer Dam. The application provided the following average flow rates in this part of the Niobrara: At low water stage, the river supplied 1,100 cfs; at medium water stage, 1,450 cfs; and at high water stage, 3,300 cfs. The application was approved for 1,450 cfs "subject to the provisions of the Nebraska Irrigation Laws, which gives preference to appropriators using the water for domestic and agricultural uses, over those using it for manufacturing and power purposes." The dam was originally built in 1927.

By the time the 1923 application was approved, Nebraska had adopted the 1920 constitution, which included the statutory preferences for water use in times of scarcity. Additionally, however, article XV, § 6, of the Nebraska Constitution explicitly requires a user with a higher priority for the water to compensate an appropriator with a senior appropriation. So the 1923 permit's reference to Nebraska's preference laws acted as a notice that water users with higher priorities were entitled to use the water appropriated to NPPD's predecessor if they paid compensation for the water.

In 1941, the U.S. government applied for a permit to divert and store 47,670 acre-feet of water from the Niobrara River in the Box Butte Reservoir near Chadron, Nebraska. This application was part of the Bureau of Reclamation's Mirage Flats project to build a dam and irrigation canal. The dam and

reservoir operate to send stored water from the Niobrara to the Mirage Flats Canal for irrigation and domestic use. The hydropower company that is NPPD's predecessor in interest for the Spencer hydropower facility protested the government's application and the assignment of other appropriations to the government for water storage.

In 1942, while the government's application was pending, the hydropower company applied for 550 cfs, in addition to 1,450 cfs that it received under the 1923 application, to increase the river's head at the Spencer Dam. In 1943, while the company's application was pending, the hydropower company executed a subordination agreement with the government. For the agreed-upon amount of $25,000 in damages, the company subordinated to the government its 1923 appropriation for 1,450 cfs and, if approved, its 1942 application for an additional 550 cfs. The company specifically agreed that despite its priority date, its water rights would be subordinate and inferior to the government's rights to the extent that it diverted the water to the Mirage Flats Canal. The company further recognized the government's intent to use waste, seepage, and return-flow waters for irrigation. But the agreement did not apply to any waters "when and after they have become a part of the measureable flow of the main Niobrara River in the section below the diversion dam of the Project."

In September 1943, the chief of the Bureau of Irrigation, Water Power, and Drainage wrote the state engineer for the Department's predecessor that the Niobrara was over appropriated; he recommended a clause providing that the water granted under the 1942 application could be denied in times of scarcity. That recommendation was incorporated into the permit. Like the 1923 permit, the 1942 permit approved the application "subject to the provisions of Section 46-504 Complied Statutes of Nebraska 1929, which gives preference to appropriators using water for domestic and agricultural uses over those using it for manufacturing purposes." But unlike the previous permit, the 1942 permit explicitly stated the appropriation was subject to the following limitation: "[T]he records show the normal supply of water of the Niobrara River is over-appropriated, and the applicant under this permit is hereby

given notice that it may be denied the use of water during times of scarcity."

This second limitation is more than a notification that other users with a higher preference right could condemn NPPD's water rights. It operated as a conditional water right, with the Department's reserving the right to deny 550 cfs to NPPD in times of scarcity, regardless of whether other users have condemned its rights. And the record shows that this is how the Department has treated the appropriation. That is, before 2007, when considering applications with a higher use priority, the Department has treated NPPD's use of the water to produce electricity as an incidental benefit of the river's waters.

By 1964, the appropriations for hydropower at Spencer Dam were owned by the Consumers Public Power District (Consumers), which also held appropriations for a hydropower facility in Valentine. Much earlier, the Bureau of Reclamation had planned to build the Merritt Reservoir near Valentine on the Snake River, a tributary of the Niobrara. The Merritt Reservoir was intended to supply irrigation water for about 34,000 acres through a planned Ainsworth irrigation canal.

But the government recognized that the project would interfere with Consumers' power production at its Valentine and Spencer facilities. So a 10-year study was conducted to determine how much of Consumers' power production capacity would be lost from 1964, when water storage at the Merritt Reservoir began, until 1975, when the Valentine facility was estimated to reach the end of its useful life and the Spencer facility's lease would expire. In March 1964, the Bureau of Reclamation and Consumers executed a permanent subordination contract. The bureau agreed to provide a specified number of replacement kilowatt hours until January 1975 as compensation for its interference with Consumers' rights. Consumers agreed the replacement energy would constitute full compensation for its "loss of water and generating capacity." Consumers subordinated its appropriations to the government and the Ainsworth Irrigation District for the irrigation of 33,960 acres of land in the Ainsworth unit. The contract was specifically made binding on the parties' successors.

Finally, in 1996, NPPD successfully applied to change the point of diversion for the 1896 appropriation of 35 cfs to the Spencer hydropower facility. But the Department approved the transfer on the condition that NPPD could not demand this water except from the holders of specified junior appropriations that were upstream of the original mill dam on the Minnechaduza Creek.

### GOVERNING PRINCIPLES

The Nebraska Constitution dedicates the "use of the water of every natural stream within the State of Nebraska . . . to the people of the state for beneficial purposes."[2] It further provides that the "right to divert unappropriated waters of every natural stream for beneficial use shall never be denied except when such denial is demanded by the public interest."[3] Under these constitutional provisions, a water appropriator has the right to use the public's water for a beneficial purpose, but does not have ownership of the water.[4] The requirement that the water be applied to a beneficial use operates as a condition subsequent on the right acquired and defines the limits of the holder's water rights.[5] So, actively applying appropriated water to a beneficial use is an ongoing requirement to maintain appropriative water rights.

To avoid waste of this resource, we have recognized common-law claims of abandonment and nonuse, in addition to the statutory cancellation procedures for nonuse.[6] We have also held that a landowner can invoke the statutory cancellation

---

[2] Neb. Const. art. XV, § 5.

[3] *Id.*, § 6.

[4] See *In re Application of A-15738*, 226 Neb. 146, 410 N.W.2d 101 (1987).

[5] See, *Central Platte NRD v. State of Wyoming*, 245 Neb. 439, 513 N.W.2d 847 (1994). *In re Application of A-15738, supra* note 4; *State v. Nielsen*, 163 Neb. 372, 79 N.W.2d 721 (1956). See, also, Neb. Rev. Stat. § 46-229 (Reissue 2010).

[6] See, *In re 2007 Appropriations of Niobrara River Waters*, 283 Neb. 629, 820 N.W.2d 44 (2012); *In re Application of A-15738, supra* note 4; *Nielsen, supra* note 5. See, also, *In re Applications T-61 and T-62*, 232 Neb. 316, 440 N.W.2d 466 (1989).

procedures in a petition to the Department.[7] Here, the issues are common-law abandonment and forfeiture under the statutory cancellation procedures. For statutory cancellation, the Department must find that an appropriator has not beneficially used the water for more than 5 consecutive years.[8] But a proponent is not required to show that an appropriator has abandoned or forfeited its entire allotment. Because an appropriator must use Nebraska's waters for a beneficial purpose and to avoid waste, an appropriator's water rights can be lost in whole or in part.[9]

### NPPD's Investments Should Not
### Preclude a Finding of Partial
### Abandonment or Forfeiture

Under these principles, the Department should treat NPPD's appropriations as a bundle of rights, not an all or nothing proposition. I disagree with the majority's conclusion that no abandonment has occurred because NPPD was current on its lease payments, had spent money on its operations and staff, and had used its full allotment on occasion. NPPD is required to invest in its facility and personnel to protect the public and make use of the water it receives at Spencer Dam, even if the evidence shows that it had abandoned or forfeited part of its appropriations or accompanying rights.

NPPD's investments are particularly required here because Spencer Dam is a run-of-the-river dam. That means NPPD does not divert water through a canal or ditch and store it in a reservoir behind a dam. It has no permit for storage capacity to ensure that enough water flows through the dam to generate electricity even when the river's flow is low. Instead, the dam increases the height of the river's flow enough to create hydraulic "head," or pressure. As the water falls through the dam, this hydraulic pressure spins the turbines, which turn the generators that produce current. But because Spencer

---

[7] See *In re 2007 Appropriations of Niobrara River Waters*, *supra* note 6.

[8] See § 46-229.

[9] Neb. Rev. Stat. § 46-229.02(1) (Reissue 2010). See A. Dan Tarlock, Law of Water Rights and Resources § 5:88 & n.1 (2013).

Dam spans the Niobrara, NPPD must maintain it in a manner to safely handle high flow periods and floods.[10] It is true that NPPD has made investments to handle these periods. But because NPPD must do this regardless of the size of its appropriations, I disagree that its maintenance or operating costs alone can show that it has not abandoned any part of its bundle of rights.

More important, the majority can only affirm this order by ignoring the nature of the separate appropriations held by NPPD, the scarcity of days that NPPD has actually received its full allotment, and the Department's implicit determination that other uses of the Niobrara's waters are more beneficial than NPPD's ability to produce electricity.

### NPPD Has Never Protected Its Conditional Right to Demand 550 CFS Under Its 1942 Appropriation

Initially, I clarify that under its 1896 appropriation, there is no question that NPPD never had a right to demand 35 cfs from upstream junior appropriators on the Niobrara itself. The limitation in the approval of its transfer of this appropriation to Spencer Dam clearly stated that it could only demand this water from specified junior appropriators on the Minnechaduza Creek.

Moreover, I would hold that NPPD has forfeited the right to demand 500 cfs under its 1942 appropriation. The record shows that the Department specifically closed the rights of upstream junior appropriators to satisfy this appropriation. Yet, a field supervisor acknowledged that NPPD's appropriations are large enough to claim the river's entire flow for some parts of the year. And the parties stipulated that since 1942, the Department has approved more than 400 surface water appropriation applications. The Department approved these applications despite its acknowledgment in NPPD's 1942 permit that the Niobrara was over appropriated and its imputed knowledge that the flow rate at the eastern end of the Niobrara was not sufficient to satisfy NPPD's total allotment most of the year.

---

[10] See Neb. Rev. Stat. §§ 46-1663 and 46-1664 (Reissue 2010).

The record shows that NPPD regularly monitors new applications for appropriations and has protested applications in the past. Clearly, it could have protested all of these 400 applications, yet it apparently did not contest the majority of them. Additionally, in December 2005 and December 2006, the Department issued reports that the Niobrara River Basin was not fully appropriated. These reports were effectively a public statement that the river still contained water for new appropriations.

The Department's actions are inconsistent with a determination that NPPD is entitled to demand its full allotment. Knowing since 1942 that the river's normal flow was already over appropriated and was insufficient to satisfy NPPD's total allotment, the Department could not have approved further appropriations unless it had concluded that NPPD did not use or was not entitled to demand its full allotment for power generation. And the record contains support for this conclusion.

While the Niobrara's flow rate has varied over the years, its flow pattern is not that different from 1923. As stated, the 1923 application for 1,450 cfs showed that Niobrara's flow would not satisfy the applicant's full request for 1,450 cfs during much of the year and would normally equal or exceed 2,035 cfs only during its high stage period. Yet before 2007, NPPD had never requested the Department to administer other water rights for NPPD's benefit, even during earlier periods of drought in the 1950's and 1970's. The record shows that NPPD has simply accepted whatever amount of water flowed to its dam.

We do not know why the Department approved 400 appropriation applications since 1942. But we know it is charged with knowledge of streamflow data and diversion records. And we cannot assume that the Department issued this many permits for diversions knowing that no unappropriated water was available.

Moreover, I disagree that NPPD had no duty to protect its rights under the 1942 appropriation. It is true that senior appropriators normally are unaffected by the initial approval of a junior appropriation. But the 1942 appropriation is different because it is a conditional right and the permit

specifically stated that the river was over appropriated. So NPPD knew that every additional appropriation would create a greater scarcity of resources that could result in a denial of its right to use 550 cfs. That is, the Department's approvals of other appropriations were contrary to NPPD's purported right to demand 550 cfs—and NPPD knew that. I do not dispute NPPD's right to use the water when it is available. But under these circumstances, NPPD's acquiescence to the Department's actions should constitute a forfeiture of its right to demand 550 cfs under its 1942 appropriation.

### The Department Should Determine the Effect of NPPD's Subordination Agreements on Its Right to Demand Water From Upstream Junior Appropriators

Of course, even if NPPD cannot demand 35 cfs under its 1896 appropriation or 550 cfs under its 1942 appropriation, that conclusion would not resolve every issue in this case. Its largest appropriation was granted in 1923 for 1,450 cfs. This single appropriation was satisfied for only an average 208 days (57 percent) of the year during the 68 recorded years in this record. The question is why NPPD or its predecessors did not demand water under the 1923 appropriation in all these decades. The answer may lie in the subordination agreements with the government for the Bureau of Reclamation's irrigation projects.

A field supervisor testified that irrigation at the Ainsworth irrigation canal is known to affect the flow rate at Spencer Dam. As noted, under the 1943 and 1964 subordination agreements with the government, NPPD's predecessors subordinated its right to water for its 1923 and 1942 appropriations. So the Bureau of Reclamation was allowed to keep pumping water when the Department issued closing notices. The Department administered NPPD's 2007 call only against junior appropriators who did not have a subordination agreement with NPPD. But the junior appropriators argued that a senior appropriator could not accept compensation to take its allotted water out of the river and then demand the water from other junior appropriators. On appeal, the Department argues that

NPPD's subordination agreements did not affect NPPD's right to demand the water from other users.

The majority opinion rejects the junior appropriators' argument that permitting NPPD to demand the water from them constituted a recovery of both money and water for loss of the same appropriation right. It reasons that if a "junior appropriator is allowed to use water because of a subordination agreement, the senior appropriator is not receiving that to which it is otherwise entitled." I disagree. This reasoning is contrary to the election of remedies doctrine. An appropriator can enforce an appropriation right or a contract to compensate it for the use of its water, but it is not entitled to a double recovery for the same loss.[11]

Clearly, a senior appropriator cannot demand water from a junior appropriator which has paid compensation for the water's use.[12] But application of the election of remedies doctrine may require other considerations in the context of water law. Because the director did not decide this issue, I would remand the cause for further consideration of the evidence to determine the effect of the subordination agreements on NPPD's right to demand water from the junior appropriators.

---

[11] See *Genetti v. Caterpillar, Inc.*, 261 Neb. 98, 621 N.W.2d 529 (2001).

[12] See *Clear Springs Foods, Inc. v. Spackman*, 150 Idaho 790, 252 P.3d 71 (2011).

---

IN RE APPLICATION OF LORETTA D. COLLINS FOR
ADMISSION TO THE NEBRASKA STATE BAR.
___ N.W.2d ___

Filed July 11, 2014.    No. S-13-1020.

1. **Rules of the Supreme Court: Attorneys at Law: Appeal and Error.** Under Neb. Ct. R. § 3-126 (rev. 2013), the Nebraska Supreme Court considers the appeal of an applicant from a final ruling of the Nebraska State Bar Commission de novo on the record made at the hearing before the commission.

2. **Rules of the Supreme Court: Attorneys at Law.** The Nebraska Supreme Court is vested with the sole power to admit persons to the practice of law in this state and to fix qualifications for admission to the Nebraska bar.